<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| DETECTIVE DAVID TORTORA, SERGEANT TOM MILLER, and OFFICER MARC RISPOLI, | |
| *Plaintiffs,* | Civil No.: 23-cv-1661 (KSH) (ESK) |
| v. | |
| BOROUGH OF BERGENFIELD, MAYOR ARVIN AMATORIO, ADMINISTRATOR COREY GALLO, COUNCILPERSON RAFAEL MARTE, COUNCILPERSON SALVADOR DEAUNA, COUNCILPERSON ORA C. KORNBLUTH, COUNCILPERSON THOMAS A. LODATO, COUNCILPERSON MARC PASCUAL, and COUNCILPERSON HERNANDO RIVERA, | <u>**OPINION**</u> |
| *Defendants.* | |

<u>**Katharine S. Hayden, U.S.D.J.**</u>

**I.    Introduction**

Plaintiffs are three police officers—Detective David Tortora, Officer Marc Rispoli, and Sergeant Tom Miller—employed with the Bergenfield Police Department ("BPD"). They assert that they were not promoted due to their race (Caucasian) and membership in and activities taken as members of the local Police Benevolent Association ("PBA"), and have sued the borough of Bergenfield (the "borough"), its mayor, Arvin Amatorio, borough administrator Corey Gallo, and six members of the borough council, Rafael Marte, Salvador Deauna, Ora C. Kornbluth, Thomas A. Lodato, Marc Pascual, and Hernando Rivera (collectively, "defendants"). Plaintiffs have asserted claims for violation of equal protection, race discrimination, First Amendment retaliation, and analogous state law claims. Presently before the Court is defendants' motion to dismiss under

Fed. R. Civ. P. 12(b)(6).  In considering the motion, the Court must accept all well-pleaded factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff to determine if the complaint "state[s] a claim to relief that is plausible on its face."  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

Applying that standard of review, the motion to dismiss will be granted in part and denied in part.

## II.   Background

### A.  The Parties

The operative amended complaint (D.E. 8, Am. Compl.) alleges as follows.  Plaintiffs are employees of the BPD.  (*Id.* ¶¶ 6-8.)  All three are Caucasian and members of the PBA.  (*Id.* ¶¶ 6-8, 18-21.)  Tortora served in the Marine Corp from 2003 to 2009, has served as a BPD police officer since 2010, and has been the PBA Local 309 president since July 2018.  (*Id.* ¶¶ 18, 19.)  Rispoli has served as a BPD police officer since 2008 and previously served as a provisional sergeant in May 2018.  (*Id.* ¶ 21.)  Miller has served as a BPD police officer since 2005 and is a member of the BPD Honor Guard—a volunteer unit that is not part of his official duties.  (*Id.* ¶¶ 20, 69, 70.)

The borough is governed by a mayor and a six-member legislative council.  (*Id.* ¶ 9.)  The borough delegates all executive responsibilities to the borough administrator, Gallo.  (*Id.* ¶¶ 9, 11.)  At all times relevant to this dispute, defendant Amatorio served either as a councilperson or the mayor, and defendant Marte served as council president.  (*Id.* ¶¶ 10, 12.)  Other council members include defendants Deauna (*id.* ¶ 13), Kornbluth (*id.* ¶ 14), Lodato (*id.* ¶ 15), Pascual (*id.* ¶ 16), and Rivera (*id.* ¶ 17).

The amended complaint describes Amatorio, Deauna, and Pascual as "Filipino," Marte and Rivera as "Hispanic," Gallo and Lodato as "Caucasian," and Kornbluth as "Jewish."  (*Id.* ¶¶ 11-17.)

### B.   Failed Contract Negotiations from 2017 to 2022

In September 2017,[1] the PBA, through its president, Tortora, began negotiating with administrator Gallo and the borough for a new collective bargaining agreement ("CBA").  (*Id.* ¶ 22.)  Disagreement over the issue of healthcare contributions stunted the negotiations, and continued to do so over the course of the next five years.

The parties' first attempt to come to an agreement through arbitration on May 9, 2018 was unsuccessful.  (*Id.* ¶ 23.)  After scheduling a second arbitration for July 9, 2018, Tortora invited the mayor and the council to attend.  (*Id.* ¶ 24.)  That prompted the council to issue Tortora a cease-and-desist letter on June 11, 2018.  (*Id.*)  The July 9, 2018 arbitration was ultimately unsuccessful because of continued disagreement over healthcare contributions.  (*Id.* ¶¶ 23, 25.)  Administrator Gallo filed an interest arbitration petition with the Public Employment Relations Commission ("PERC")[2] on August 2, 2018.  (*Id.* ¶ 26.)

Tortora, allegedly in his capacity as PBA president and while off-duty, attended a public council meeting on August 21, 2018.  (*Id.* ¶ 27.)  He introduced himself as "Dave Tortora, . . . the President of PBA Local 309" and explained that he was "here tonight with my fellow brothers and sisters because the Borough has filed for interest arbitration after refusing to negotiate . . . in good faith."  (*Id.* ¶ 28.)  He described what he perceived as Gallo's "take it or leave it attitude" in

---

[1] In what appears to be an error when compared to the dates of the other relevant events alleged, the amended complaint states that negotiations began in September 2018.  (*See id.* ¶ 22.)
[2] Under N.J.S.A. 34:13A-16b(2), any party to a collective negotiation agreement may file a petition with PERC for arbitration once the agreement expires.

demanding "we accept changes to our healthcare contributions" because that is "what the Mayor and Council want[]." (*Id.*)  He also mentioned the cease-and-desist letter he received after inviting the mayor and council to attend arbitration.  (*Id.*)  He added that he sent them a letter explaining the negotiations but never heard back.  (*Id.*)  He accused Gallo of "destroying the relationship between the Council and the PBA," and claimed: "When I came here almost 9 years ago, from the Sheriff's Department, I felt proud to find a home in Bergenfield.  I was welcomed by the Mayor and Council, and I told them I would not let them down.  I have held up my side of the bargain. Unfortunately you have not." (*Id.*)  He concluded by expressing his "disappoint[ment]" in the council's "lack of leadership." (*Id.*)

The parties' continued disagreement over healthcare contributions defeated another arbitration attempt shortly afterwards.  (*Id.* ¶¶ 30, 31.)  On September 20, 2018, the borough and the PBA withdrew their interest arbitration petition with PERC and filed another petition seeking a new arbitrator.  (*Id.* ¶ 32.)

Finally, successful arbitration sessions occurred on October 22 and November 20, 2018, with the new PERC arbitrator entering an interest arbitration award and approving the finalized CBA on December 27, 2018.  (*Id.* ¶¶ 35, 36.)  But the defendants did not sign the final PERC-approved CBA.  (*Id.* ¶ 37.)

Several months later, on September 11, 2019, Tortora and the PBA filed an unfair labor practice charge with PERC against the borough, asserting the refusal to sign the PERC-approved CBA violated the New Jersey Employer-Employee Relations Act.  (*Id.* ¶¶ 38, 55.)

Approximately five months later, on February 5, 2020, Tortora and the PBA filed a complaint against the borough in Bergen County Chancery Court seeking a court order to compel the borough to abide by the PERC-approved CBA.  (*Id.* ¶ 59.)

On February 10, 2020, PERC entered summary judgment in favor of the PBA on the unfair labor practice charge, concluding that the borough had violated the New Jersey Employer-Employee Relations Act by refusing to sign the CBA and ordering the borough to sign the CBA immediately.  (*Id.* ¶ 61.)  Gallo and the borough appealed (*id.* ¶ 61) and approximately two years later, on January 14, 2022, a PERC arbitrator issued a "clarified" arbitration award.  (*Id.* ¶ 98.)  Tortora and the PBA appealed.  (*Id.* ¶ 98.)

### C.  Promotions in 2019

In August 2019, a month before Tortora and the PBA filed their unfair labor practice charge with PERC, the borough council voted to promote then-captain Mustafa Rabboh as chief of police.  (*Id.* ¶ 40.)  According to the amended complaint, Rabboh is Muslim and immigrated from Palestine, and defendants were allegedly "eager to publicly flaunt" the fact that he was the first Muslim police chief in Bergen County and the second in all of New Jersey.  (*Id.* ¶¶ 40, 41.)  Rabboh was a captain, and was chosen over then-deputy chief, Christopher Massey, who is not a party to this lawsuit but who plaintiffs assert is "a white officer with more seniority, experience, and qualifications" than Rabboh.  (*Id.* ¶ 40.)  The amended complaint alleges that in an unrelated lawsuit, councilperson Deauna testified that he voted for Rabboh over Massey "because he is a minority."  (*Id.* ¶ 42.)

On September 26, 2019, shortly after Tortora and the PBA filed their unfair labor practice charge with PERC, Gallo certified the promotional lists for certain BPD positions.  (*Id.* ¶ 43.)  The amended complaint alleges that the lieutenant promotional list ranked Miller second, and the sergeant promotional list ranked Rispoli second and Tortora third.[3]  (*Id.* ¶¶ 44, 45.)

_____

[3] The 2019 sergeant promotional list (D.E. 26, Ex. G) and the 2020 lieutenant promotional list (D.E. 26, Ex. C) attached to defendants' moving brief confirm that Miller and Rispoli were ranked second, but show that Tortora ranked fourth, not third.  The Court may properly consider these

On October 20, 2019, two weeks before the general election for mayor and councilperson, Rabboh used the BPD Instagram account to post a photo of BPD members with mayoral candidate Amatorio and councilperson candidate Rivera.  (*Id.* ¶ 46.)  In response, Tortora used the PBA Instagram account to comment on the BPD post that the PBA does "not endorse political candidates."  (*Id.* ¶ 47.)  Hours after Tortora's PBA Instagram comment and "as punishment," Rabboh assigned Tortora to two patrol shifts.  (*Id.* ¶ 49.)

After an email exchange, Rabboh and Tortora met on October 28, 2019 to discuss their recent Instagram comments.  (*Id.* ¶ 50.)  The amended complaint recites that Rabboh told Tortora that "your words are going to bite you in the ass in the future"; that Rabboh had defended Tortora to "certain people"; and that the mayor and the council could "make their lives difficult by not making promotions."  (*Id.* ¶¶ 50, 51.)  Rabboh added: "Who's to say that I call for promotions and then the stall tactics begin because you are [in the eyes of the administrator, the mayor, and the council] an [a**]hole.  That's out of my hands.  Ultimately they decide who they want to promote."  (*Id.* ¶¶ 50, 52.)  Tortora responded, "I've thought about it, again, I always try to think about what's better for the union, not just me," to which Rabboh replied, "If for whatever reason they want to be [a**]holes and they freeze the list until the next test, guess what, it [f***ks] you and everyone behind you on the list who is in line to get promoted.  Just because you think you won the battle, if you lose the war, it's not worth fighting the battle."  (*Id.* ¶¶ 53, 54.)

Following the election, on November 7, 2019, the council voted to promote then-lieutenant John Maggi[4] to captain to fill the vacancy left by Rabboh's promotion to chief.  (*Id.* ¶ 57.)  Maggi

---

lists, as there is no dispute that they are "integral to and relied upon in the complaint."  *Lum v. Bank of Am.*, 361 F.3d 217, 221 n.3 (3d Cir. 2004).  Defendants also attach the 2022 promotional lists (D.E. 26, Ex. E-F), which are less relevant insofar as defendants refer to them in connection with their due process contentions.  *See* section IV, *infra*.

[4] The amended complaint does not state Maggi's race or ethnicity.

was the only lieutenant on the captain promotional list at the time of his promotion.  (*Id.* ¶ 57.)
The council then promoted a sergeant to lieutenant and an officer to sergeant who were both ranked
first on their respective lists and both Hispanic to fill the new vacancies.  (*Id.* ¶¶ 57, 58.)

After those promotions, Miller ranked first on the lieutenant promotional list,[5] Rispoli
ranked first on the sergeant promotional list, and Tortora ranked second on the sergeant
promotional list.  (*Id.* ¶ 58.)

### D.  Promotions in 2020

In March 2020, Rabboh sent Rispoli to attend a professional development program
designed for officers who are "about to assume their first supervisory role."  (*Id.* ¶ 62.)  Later that
month, a retirement created a new lieutenant vacancy, which the council filled with a sergeant who
is Hispanic in July 2020.  (*Id.* ¶¶ 63, 64.)  That promotion created a sergeant vacancy, which
"should have been immediately filled by Officer Rispoli" as he was first on the sergeant
promotional list.  (*Id.* ¶¶ 58, 65.)  The amended complaint does not allege who was appointed
instead.

In July 2020, another retirement created a lieutenant vacancy, which "should have been
immediately filled by Sergeant Miller," now first on the lieutenant promotional list.  (*Id.* ¶¶ 58,
66.)  Miller's promotion would have then created a sergeant vacancy, for which Tortora stood in
line—presumably because Rispoli would have already been promoted to fill the prior sergeant
vacancy, leaving Tortora first on the list.  (*Id.* ¶¶ 58, 67.)  And, "since Detective Tortora is a
veteran, [the council] could not have skipped him for a promotion under the Civil Service Rules."
(*Id.* ¶ 68.)  The amended complaint does not allege who was promoted.

---

[5] The June 18, 2020 lieutenant list provided by defendants suggests Miller ranked second until July
21, 2020.  (D.E. 26, Ex. C.)

The amended complaint does note, however, that back in October 2018, when the parties were in the middle of their arbitration efforts, Gallo had told then-chief Cathy Madalone and then-deputy chief Massey that Tortora would "never be promoted" to sergeant.  (*Id.* ¶ 33.)  Gallo also asked Madalone to remove Tortora from the detective bureau, but she refused.  (*Id.* ¶ 34.)

### E.  Promotions Stall in 2021

In January 2021, Gallo invited the BPD Honor Guard to participate in a mayor and council reorganization meeting.  (*Id.* ¶ 71.)  Miller, as a volunteer member of the Honor Guard, declined "in protest of defendants' refusal to negotiate with the PBA in good faith."  (*Id.*)  On January 5, 2021, Maggi told Miller that Rabboh viewed Miller's decision as "career suicide."  (*Id.* ¶ 73.)  Soon afterwards, Rabboh disbanded the Honor Guard.  (*Id.* ¶ 74.)  When Miller spoke to Rabboh on January 28, 2021 about his prospects of being promoted to lieutenant, Rabboh said his "hands were tied."  (*Id.* ¶ 75.)

In April 2021, Rabboh sent Rispoli and Tortora, respectively first and second on the sergeant list, to telecommunicator/emergency medical dispatch training in anticipation of their promotion to sergeant.  (*Id.* ¶¶ 58, 77, 78.)  He then attempted to discuss the promotion of Tortora, Rispoli, and Miller with the council and the mayor several times to no avail.  (*Id.* ¶¶ 76, 79, 80.)

In a July 21, 2021 conversation, Rabboh told Tortora he had attempted to meet with the council and the mayor several times to discuss the BPD's need for three promotions, but the mayor "did not seem enthusiastic" about the promotions once he learned Miller, Rispoli, and Tortora were at the top of the list.  (*Id.* ¶¶ 80, 81.)  Rabboh added that he had not spoken to Gallo about the promotions because he had not been "receptive" when they previously discussed it.  (*Id.* ¶ 82.)

In August 2021, Rabboh sent an email about promotions to Gallo, Amatorio, Rivera, Kornblush, and Pascual.  (*Id.* ¶ 83.)  In September they told him the promotional lists had expired.

(*Id.* ¶ 84.)  Rabboh replied that the lists were still valid after being extended due to COVID-19. (*Id.*)

Rabboh told Tortora that he would be going to a council meeting on October 18, 2021 when he believed the council would be voting on promotions.  (*Id.* ¶ 85.)  Afterwards, Rabboh told Miller that based on his conversation with the mayor, it would be an "uphill battle" and the chances of getting the promotions did not "look good."  (*Id.* ¶ 86.)  He also told Tortora that Gallo "lied and told Mayor Amatorio and the council that the promotional lists *did expire*."  (*Id.* ¶ 87.) According to Rabboh, Amatorio and the council were "playing games."  (*Id.* ¶ 88.)  On October 29, 2021, Rabboh emailed the council defendants to request "that promotions be made as soon as possible."  (*Id.* ¶ 89.)  He even sent Tortora to a police supervision training in November.  (*Id.* ¶ 90.)

The amended complaint asserts that in a November conversation between councilperson Rivera and another police officer, Rivera noted that the promotional lists had expired and that the PBA "should vote to remove Detective Tortora as PBA president because it was 'not easy' to negotiate with him."  (*Id.* ¶ 91.)

On December 6, 2021, Rabboh told Tortora that the mayor had assured him the council would vote on promotions at the upcoming December 7 meeting.  (*Id.* ¶ 92.)  Rabboh instructed Tortora, Rispoli, and Miller to purchase new uniforms and tell their families.  (*Id.* ¶ 92.)  On December 7th the council did not vote on promotions, and on December 20th Rabboh told Tortora he was no longer hopeful that the council would vote on any promotions at their upcoming December 21st meeting.  (*Id.* ¶¶ 93, 94.)

Soon after that Tortora learned that Amatorio and the council "ceased communications with Chief Rabboh regarding promotions," and that Gallo and Rivera "attempted to sway the PBA membership into removing [Tortora] as President." (*Id.* ¶¶ 95, 96.)

On December 21, 2021, Tortora sent the following email to the defendants:

> I would appreciate it if you stopped approaching members of the PBA and asking if they can remove me as president of the union because I am not "easy" to negotiate with. Or telling them younger officers are being hurt because of my negotiations. We were ready to accept the Mayor's offer. Even going as far as having me send an email to the BA [borough administrator] and himself with the wording he agreed to, which was later reneged upon. All offers have been presented to the members who have unanimously voted no consistently. The only way to remove me as president is if I die, or if I am promoted. So please stop asking my members about it (Corey [Gallo], Councilman Rivera) they do not believe you as I have been transparent with them every step of the way and they no longer wish to speak with you about it further.

(*Id.* ¶ 96.)

Around January 14, 2022, Tortora submitted an Open Public Records Act ("OPRA") request to the borough "seeking, among other things, written communications between Chief Rabboh, BA Gallo, and the council members discussing promotions." (*Id.* ¶ 100.) After the OPRA request, Rabboh began "ignoring" Tortora at work and "freezing him out of his typical work functions." (*Id.* ¶ 102.)

### F. Expiration of the Promotional Lists in 2022

Defendants did not promote Miller to lieutenant before the lieutenant promotional list expired on April 12, 2022. (*Id.* ¶ 103.) Similarly, they did not promote Rispoli or Tortora to sergeant before the sergeant promotional list expired on October 19, 2022. (*Id.* ¶ 105.)

### G. Procedural History

On March 23, 2023, plaintiffs filed a six-count complaint (D.E. 1) in this Court bringing claims against all defendants for First Amendment retaliation and equal protection violations under 42 U.S.C. § 1983, racial discrimination under 42 U.S.C. § 1981, and violations of the New Jersey Constitution and the New Jersey Civil Rights Act, N.J.S.A. 10:6-2.  Plaintiffs filed an amended complaint (D.E. 8) on May 24, 2023 after defendants had filed a motion to dismiss (D.E. 7), which Magistrate Judge Kiel administratively terminated.

In the operative amended complaint (D.E. 8), plaintiffs argue they have suffered economic and reputational loss along with emotional distress as a result of the defendants' unlawful discrimination based on race and unlawful retaliation for plaintiffs' constitutionally protected activities of PBA membership, PBA-related activities and speech, and contract negotiations.

On June 21, 2023, defendants filed the present motion (D.E. 11) to dismiss all counts for failure to state a claim upon which relief may be granted under Fed. R. Civ. P. 12(b)(6). Defendants attached several exhibits (D.E. 11-3 to D.E. 11-11), including promotional lists that were later modified to include redactions (D.E. 26).  Plaintiffs opposed (D.E. 16), and defendants filed a reply (D.E. 20).

### III.    Standard of Review

When considering a defendant's motion to dismiss under Fed. R. Civ. P. 12(b)(6), the Court must accept all well-pleaded factual allegations as true and draw all reasonable inferences in favor of the plaintiff, but need not accept as true "a legal conclusion couched as a factual allegation." *See Iqbal*, 556 U.S. at 678 (2009); *Twombly*, 550 U.S. at 555.

A complaint will not be dismissed if the factual allegations "state a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 678.  A claim is sufficiently plausible when it has pleaded sufficient factual content to show "more than a sheer possibility that a defendant has acted

11

unlawfully" and enough to allow the court to draw a "reasonable inference that the defendant is liable." *Id.* At the dismissal stage, the "primary question" is not whether the plaintiff will ultimately prevail, but rather whether the plaintiff is "entitled to offer evidence to establish the facts alleged." *Fenico v. City of Phila.*, 70 F.4th 151, 161 (3d Cir. 2023). The plaintiff's complaint must "detail enough facts to raise a reasonable expectation that discovery will reveal evidence of each necessary element." *Id.*

## IV.     The § 1983 Equal Protection Claim (Count I)

To state an equal protection claim under 42 U.S.C. § 1983, a plaintiff "must allege that a state actor intentionally discriminated against him because of his membership in a protected class." *Lande v. City of Bethlehem*, 457 F. App'x 188, 192 (3d Cir. 2012). The complaint must allege "the existence of purposeful discrimination" by "demonstrat[ing] that [plaintiff] received different treatment from that received by other individuals *similarly situated*." *Shuman v. Penn Manor Sch. Dist.*, 422 F.3d 141, 151 (3d Cir. 2005).

The "threshold question" is whether other individuals, "though perhaps treated differently," were "similarly situated in the first place." *Id.* Parties are "similarly situated" when they are "alike in all relevant aspects." *Kazar v. Slippery Rock Univ. of Pa.*, 679 F. App'x 156, 162 (3d Cir. 2017) (cleaned up). If they have "critically important" differences, they are not "similarly situated," and an equal protection claim must fail. *Id.* Determining whether parties are similarly situated "requires a court to undertake a fact-intensive inquiry on a case-by-case basis rather than in a mechanistic and inflexible manner." *Monaco v. Am. Gen. Assur. Co.*, 359 F.3d 296, 305 (3d Cir. 2004); *see, e.g., Boyer v. City of Phila.*, 2015 WL 9260007, at *5 (E.D. Pa. Dec. 17, 2015) (denying dismissal of an equal protection claim where plaintiff, an African-American police officer, plausibly showed that she was terminated for her misconduct while similarly-

situated white officers, lieutenants, and captains were not disciplined or were promoted for their as-serious misconduct, and concluding that the "fact-intensive nature" of the analysis "weighs in favor of permitting plaintiff to engage in discovery").

Defendants argue that plaintiffs' § 1983 equal protection claim must be dismissed because plaintiffs have not sufficiently alleged that they experienced disparate treatment or racial discrimination.[6] Plaintiffs argue, however, that they have pled purposeful discrimination based on race and disparate treatment compared to other similarly-situated officers. Defendants counter that they were consistent in promoting the candidates at the top of the promotional lists based on merit and that plaintiffs were not "similarly situated" to the officers who were ranked differently on those lists.

The Court concludes that plaintiffs have sufficiently pleaded an equal protection claim to survive a motion to dismiss. The allegations in the amended complaint, when taken as true and when drawing all reasonable inferences in favor of plaintiffs, go beyond "a sheer possibility" that defendants treated plaintiffs differently from similarly-ranked officers based on their race or ethnicity. *See Iqbal*, 556 U.S. at 678; *Shuman*, 422 F.3d at 151.

The complaint alleges that, in 2019 and 2020, when three Hispanic officers were ranked first on their promotional lists, defendants appointed them to fill new vacancies. (Am. Compl. ¶¶ 57, 58, 63, 64.) However, when new vacancies opened and plaintiffs Miller and Rispoli were

---

[6] Insofar as the defendants' moving brief makes a due process-based argument for dismissal of count I, the Court agrees with plaintiffs' opposition brief that count I makes an equal protection claim. While the standards for equal protection and due process are similar, *see Mech. Contractors Ass'n of N.J., Inc. v. New Jersey*, 541 F. Supp. 3d 477, 493 (D.N.J. 2021) (Wolfson, J.), plaintiffs do not assert a liberty or property interest here that requires the Court to engage in a due process analysis.

ranked first on their promotional lists, defendants did *not* appoint them to fill the vacancies; instead, the amended complaint alleges they stalled in making promotions (despite the efforts of the chief of police), lied about the lists expiring before their expiration dates, and eventually allowed the promotional lists to expire in 2022.  (*Id.* ¶¶ 58, 65-67, 71-96, 103, 105.)  Plaintiffs allege that per Rabboh, the mayor "did not seem enthusiastic about the promotions after he learned" plaintiffs were at the top of the lists.  (*Id.* ¶¶ 80, 81.)  Such allegations support a plausible claim that plaintiffs were treated differently from similarly-situated individuals—*i.e.*, those who ranked first on their respective promotional lists at the time of a position vacancy.

In exercising its limited role at this dismissal stage, the Court denies defendants' motion to dismiss count I.

## V.      The § 1981 Race Discrimination Claim (Count II)

Claims of race discrimination under 42 U.S.C. § 1981 are "subject to the same analysis as discrimination claims under Title VII of the Civil Rights Act of 1964," *Castleberry v. STI Grp.*, 863 F.3d 259, 263 (3d Cir. 2017), and are therefore reviewed under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  The plaintiff has the "initial burden" of establishing a *prima facie* case of discrimination.  *Id.* at 802.  If the plaintiff meets that burden, the defendant must "articulate some legitimate, nondiscriminatory reason" for the adverse employment action, and in that event, the plaintiff must show that the defendant's stated reason is merely "pretext" for intentional discrimination.  *Id.* at 802, 804.

To establish a *prima facie* case, the plaintiff must show the following elements:

> (1) [plaintiff] is a member of a protected class; (2) [plaintiff] was qualified for the position s/he sought to attain or retain; (3) [plaintiff] suffered an adverse employment action; and (4) the action occurred under circumstances that could give rise to an inference of intentional discrimination.

*Makky v. Chertoff*, 541 F.3d 205, 214 (3d Cir. 2008) (citing *McDonnell Douglas*, 411 U.S. at 802). In "reverse discrimination" suits where the plaintiff is Caucasian and therefore not a member of a protected class, the *McDonnell Douglas* framework is modified to require the plaintiff to present "sufficient evidence to allow a reasonable fact finder to conclude . . . that the defendant treated plaintiff less favorably than others because of his race." *Iadimarco v. Runyon*, 190 F.3d 151, 161, 163 (3d Cir. 1999) (cleaned up).

Defendants argue that plaintiffs have not sufficiently alleged facts to support an inference of intentional discrimination based on less favorable treatment. Plaintiffs contend that they have made factual allegations showing that defendants "regularly promot[ed] minorities" from the promotional lists in 2019 and 2020 and then froze promotions "when plaintiffs were next in line," permitting an inference of intentional discrimination.

The Court is satisfied that the amended complaint sufficiently alleges that defendants treated the first-ranked plaintiffs "less favorably" than their first-ranked counterparts based on race. Reasonable inferences may be drawn from councilperson Deauna's statement that in August 2019 he voted for the promotion of Rabboh over the Caucasian deputy chief "because he is a minority" (Am. Compl. ¶ 42) and from defendants' decision to promote first-ranked non-Caucasian officers in 2019 and 2020 soon after vacancies opened but not to promote first-ranked Caucasian plaintiffs in 2020 and 2021 (*id.* ¶¶ 57, 58, 64-67, 79-94). Instead, the defendants let the promotional lists expire in 2022 (*id.* ¶¶ 103, 105), and plaintiffs support this was intentional and race-based by asserting that once the mayor learned that the Caucasian plaintiffs were at the top of their promotional lists, he became "unenthusiastic" about promotions and that the council began lying about the promotion lists' expiration date and "playing games" regarding the council's plans to vote on promotions. (*Id.* ¶¶ 81, 87-94.) These factual assertions are sufficient "to raise a

reasonable expectation that discovery will reveal evidence" to support plaintiffs' § 1981 race discrimination claim. *Fenico*, 70 F.4th at 161. Accordingly, the Court denies defendants' motion to dismiss count II.

**VI.     The First Amendment Retaliation Claims (Counts III-VII)**

A First Amendment retaliation claim requires a public employee to allege two elements: "(1) that the activity in question is protected by the First Amendment, and (2) that the protected activity was a substantial factor in the alleged retaliatory action." *Fenico*, 70 F.4th at 162 (cleaned up). A defendant may defeat a plaintiff's retaliation claim by demonstrating that "the same action would have been taken even in the absence of the protected conduct." *Green v. Phila. Hous. Auth.*, 105 F.3d 882, 885 (3d Cir. 1997) (cleaned up).

Under the first element, the question of whether a public employee's speech is protected by the First Amendment "is a question of law that nonetheless requires a robust factual basis." *Fenico*, 70 F.4th at 162. A public employee's speech is "protected" if the employee was speaking "as a private citizen" and if the statement involved "a matter of public concern." *Id.* (cleaned up). Speech involves a matter of public concern when "it can be fairly considered as relating to any matter of political, social or other concern to the community, as opposed to a purely private intraoffice grievance." *Id.* at 163 (cleaned up). If the public employee's speech was "made pursuant to his official duties . . . [as] part of what he was employed to do," it will not be considered protected First Amendment speech, and a claim of retaliation must fail. *Garcetti v. Ceballos*, 547 U.S. 410, 413 (2006).

If the plaintiff shows that his or her speech was made as a private citizen about a matter of public concern, the Court must then apply the particularized balancing test to determine if "the employee's interest in speaking outweigh[ed] the government's interest in promoting workplace

efficiency and avoiding disruption." *Fenico*, 70 F.4th at 166 (citing *Pickering v. Board of Educ.*, 391 U.S. 563, 568 (1968)).

The amended complaint contains five separate claims of First Amendment retaliation, all asserting that the defendants violated 42 U.S.C. § 1983 by refusing to promote plaintiffs because of their protected First Amendment activities—Miller's decision to protest the 2021 mayor and council reorganization meeting (count III); Tortora's role as PBA president and his associational activities (count IV and count V); plaintiffs' membership in the PBA (count VI); and Miller and Rispoli's actual or perceived support of Tortora as PBA president (count VII).  Defendants argue that plaintiffs' retaliation claims must be dismissed because they acted in the course of their *employment* as police officers.  Defendants add that these activities and statements were not regarding matters of public concern, but rather were solely for the purposes of "advancing their careers" and airing "personal employment grievances."  In the alternative, defendants argue that even if the activities and statements were made as private citizens and/or about matters of public concern, plaintiffs' interest in the First Amendment activities would not outweigh the Borough's countervailing interest in running an efficient and effective police department.

The Court addresses each count in turn.

### A.  Count III: Miller's Protest of a Reorganization Meeting

Under count III, the Court is satisfied that plaintiffs have plausibly alleged a claim of retaliation based on Miller's decision to decline an invitation for the Honor Guard to attend the 2021 mayor and council reorganization meeting in protest of the borough's failed CBA negotiations with the PBA.  (Am. Compl. ¶ 71.)  The Court must accept as true, for present purposes, that his involvement in the Honor Guard was outside his official duties as the amended complaint alleges.  (*Id.* ¶¶ 69, 70.)  Further, the purpose of the protest was to highlight the failed

CBA negotiations, and is therefore not an official duty on Miller's part.  (*Id.* ¶ 71.)  In this District, CBA negotiations were described as a matter of public concern by Judge Irenas in *Crane v. Yurick*, 287 F. Supp. 2d 553, 560 (D.N.J. 2003) ("[T]he negotiation of a new [CBA]" is a "central union activity" that "directly implicates one of the most recognized First Amendment Protections— union-related speech" and is "clearly a matter of public concern.").  Rabboh termed Miller's decision not to attend the meeting "career suicide" (Am. Compl. ¶ 73), told Miller his "hands were tied" with regard to Miller's promotion to lieutenant (*id.* ¶ 75), and had frequent interaction with defendants about promotions (*id.* ¶¶ 76, 79), providing a plausible basis to conclude that Miller's protest was a substantial factor in the defendants' decision not to promote him.  The motion to dismiss count III is denied.

### B.  Counts IV and V: Tortora's Activities as PBA President

Again employing the required standard of review, the Court finds plaintiffs have plausibly pled a claim of retaliation based on Tortora's activities as PBA president.  In that capacity he engaged in CBA negotiations with the borough—a well-recognized protected activity under *Crane*, 287 F. Supp. 2d at 560.  He actively participated in the negotiations from 2017 to 2022 (*id.* ¶ 22); while off-duty he spoke at a council meeting criticizing the mayor, administrator, and council's handling of the CBA negotiations in August 2018 (*id.* ¶¶ 27, 28); he brought unfair labor practices charges and lawsuits against defendants in connection with the CBA negotiations from 2018 to 2022 (*id.* ¶¶ 38, 55, 59, 98); and he sent an email to defendants about the negotiations and his PBA presidency in December 2021 (*id.* ¶ 96).  Tortora used the PBA Instagram account to comment about a PBA-specific policy not to endorse political candidates for mayor or council in October 2019.  (*Id.* ¶ 47).

The amended complaint sufficiently pleads that Tortora's protected activities were a substantial factor in defendants' decision not to promote him.  Shortly after Tortora's council meeting speech and a failed arbitration attempt to negotiate the CBA, Gallo allegedly stated that Tortora would "never be promoted" to sergeant.  (*Id.* ¶ 33.)  After Tortora's PBA Instagram comment, he was assigned to two patrol shifts, raising an inference he was being punished.  (*Id.* ¶ 49.)  Rabboh then told Tortora that Gallo, Amatorio, and the council could decide to use "stall tactics" and "freeze the list" for the next promotions based on their opinion of him.  (*Id.* ¶¶ 50, 52, 54.)  After several years of Tortora's efforts to negotiate with the borough over the CBA, Rivera stated that "the PBA should vote to remove Detective Tortora as PBA president because it was 'not easy' to negotiate with him," and Gallo and Rivera attempted to sway PBA members to remove Tortora as president.  (*Id.* ¶¶ 91, 96.)  These allegations support a sufficient claim for First Amendment retaliation based on Tortora's protected activities as PBA president.  The motion to dismiss counts IV and V is denied.

### C.  Count VI: Plaintiffs' PBA Membership

As for plaintiffs' pure associational claim based on their membership in the PBA (count VI), it is well-established that union membership is "worthy of constitutional protection."  *Palardy v. Twp. of Millburn*, 906 F.3d 76, 83-84 (3d Cir. 2018) ("[I]t is hard to imagine a situation where a public employee's membership in a union would be one of his 'official duties.'")  However, plaintiffs have not plausibly alleged that their PBA membership was a *substantial factor* in defendants' decision not to promote them.  Plaintiffs have not alleged whether the other officers promoted instead of them were members of the PBA, nor presented any other facts to show more than a sheer possibility that their membership in the PBA could have played any role in their not

being promoted.  Accordingly, the motion to dismiss count VI is granted for failure to state a claim under Fed. R. Civ. P. 12(b)(6).

### D.  Count VII: Miller and Rispoli's Support of the PBA President

In count VII, plaintiffs claim defendants declined to promote Miller and Rispoli because of their actual or perceived support of Tortora as PBA president.  However, they have not alleged facts backing up that claim, particularly facts that would show their support was a substantial factor in defendants' decision not to promote them.  Accordingly, the motion to dismiss count VII is granted.

## VII.   Claims under New Jersey Constitution and Statute (Count VIII)

Defendants argue that, even if the Court allows plaintiffs' federal claims to survive dismissal, the Court should decline to exercise supplemental jurisdiction over the state law claims and dismiss them.

Defendants do not dispute, nor can they, that plaintiffs' New Jersey Constitutional and New Jersey Civil Rights Act claims set forth in count VIII are analogous to the five federal constitutional and statutory claims that are going forward.  *See Geissler v. City of Atl. City*, 198 F. Supp. 3d 389, 394 (D.N.J. 2016) (Simandle, J.) ("New Jersey courts interpret the New Jersey Civil Rights Act as analogous to § 1983"); *Hamilton Amusement Ctr. V. Verniero*, 156 N.J. 254, 264 (explaining that New Jersey courts "rely on federal constitutional principles" in interpreting the New Jersey Constitution's First Amendment analog).  As a consequence, it is appropriate for the Court to exercise supplemental jurisdiction over them, and count VIII will not be dismissed.  28 U.S.C. § 1367(a) ("[D]istrict courts shall have supplemental jurisdiction over all other claims that are so

related to claims in the action within such original jurisdiction that they form part of the same case or controversy.").[7]

## V.     Conclusion

For the reasons set forth above, defendants' motion to dismiss is granted insofar as it seeks dismissal of counts VI and VII, and is otherwise denied.  Counts I through V and count VIII shall proceed.  An appropriate order will be entered.


Dated: March 29, 2024                                    /s/ Katharine S. Hayden
                                                         Katharine S. Hayden, U.S.D.J.

---

[7] In the section of their moving brief discussing count VIII, defendants also argue that plaintiffs have not shown a policy or custom of discrimination against Caucasian officers, a necessary element of the borough's municipal liability under *Monell v. City Dep't of Social Servs.*, 436 U.S. 658, 691-95 (1978).  However, as discussed above, the Court has found the plaintiffs have made a sufficient showing of policy or custom based on the borough's promotion decisions.