**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| DETECTIVE DAVID TORTORA, SERGEANT TOM MILLER, and OFFICER MARC RISPOLI,<br>*Plaintiffs*,<br><br>v.<br><br>BOROUGH OF BERGENFIELD, MAYOR ARVIN AMATORIO, ADMINISTER COREY GALLO, COUNCILPERSON RAFAEL MARTE, COUNCILPERSON SALVADOR DEAUNA, COUNCILPERSON ORA C. KORNBLUTH, COUNCILPERSON THOMAS A. LODATO, COUNCILPERSON MARC PASCUAL, and COUNCILPERSON HERNANDO RIVERA,<br>*Defendants*. | Civil No.: 23-cv-1661 (KSH) (SDA)<br><br>**OPINION** |

**Katharine S. Hayden, U.S.D.J.**

## I. Introduction

This matter comes before the Court on the motion for summary judgment (D.E. 94) filed by defendants—the Borough of Bergenfield; its mayor, Arvin Amatorio; Borough Administrator Corey Gallo; and the members of the Borough Council, Rafael Marte, Salvador Deauna, Ora C. Kornbluth, Thomas A. Lodato, Marc Pascual, and Hernando Rivera (together, the "Borough"). Plaintiffs[1] David Tortora and Tom Miller are police officers in the Bergenfield Police Department ("BPD") who allege that the Borough refused to promote them based on their participation in activities protected by the First Amendment.

[1] On June 27, 2025, plaintiff Marc Rispoli was voluntarily dismissed from this case. (D.E. 84.)

In moving for summary judgment, the Borough's main argument is that from July 2020 through 2022, the Borough Council decided to forgo making internal promotions within the BPD because its collective bargaining agreement negotiations with the local Police Benevolent Association ("PBA") were still ongoing, and the financial implications of a new collective bargaining agreement were as yet unknown. (D.E. 94, Mov. Br., at 18.) It submits that this decision was based on legitimate, nondiscriminatory reasons unrelated to plaintiffs' activities with the PBA or their speech related to the ongoing negotiations.

For the reasons set forth below, the Borough's motion is denied.

## II. Factual Background[2]

The following facts are not in dispute unless otherwise noted. In 2010, Tortora was hired by the BPD as a patrolman/officer; in 2015, he was promoted to Detective. (D.E. 94-2, Defs. SOMF ¶¶ 1-3.) In 2004, Miller was hired as a patrolman/officer; in 2013, he was promoted to be a Sergeant. (*Id.* ¶¶ 11-13.) Miller was a member of the Honor Guard, a volunteer unit in the BPD made up of eight to ten officers whose function was to "lead parades with the flags and rifles, to stand guard at funerals, for ceremonies like the Veteran's Day ceremony, mayor and council reorganization meeting[s], [and the] 9/11 ceremony." (*Id.* ¶ 37; D.E. 95-1, Pls. SOMF ¶¶ 44-46; D.E. 95-3 & Ex. B, Deposition of Sergeant Tom Miller ("Miller Dep.") at 74:4-9.)

### A. The Parties' Relationship During the Ongoing Collective Bargaining Agreement Negotiations; Plaintiffs' Speech Criticizing the Borough

In 2018, Tortora became president of the BPD's police union, PBA Local 309, and began negotiating with the Borough, primarily through Borough Administrator Gallo, for a new

---

[2] Additional background information regarding the collective bargaining negotiations is set forth in more detail in the Court's March 29, 2024 opinion (D.E. 49) that dismissed two counts from the amended complaint, but is not necessary to repeat here.

collective bargaining agreement ("CBA"). (D.E. 94-2, Defs. SOMF ¶¶ 16, 23; D.E. 95-1, Pls. SOMF ¶ 3; *see* D.E. 95-3 & Ex. C, Deposition of Administrator Corey Gallo ("Gallo Dep.") at 55:19-57:14 (Gallo testifying that he "insulat[ed] the governing body" during these negotiations because they "want[ed] to be insulated").) These negotiations had been going on since 2015 or 2016, during which time Tortora served as the PBA's secretary and then its vice president. (D.E. 94-2, Defs. SOMF ¶ 18; D.E. 95-1, Pls. SOMF ¶ 4.) The PBA and the Borough disagreed on certain key terms in the CBA, including whether there should be a six-step or ten-step scale of BPD officers' salaries and what contributions BPD officers should make towards their health benefits. (D.E. 94-2, Defs. SOMF ¶¶ 28-29.) Over the next four years these disagreements persisted, resulting in arbitration, decisions issued by the Public Employment Relations Commission and state courts, appeals, and finally mediation. (D.E. 94-2, Defs. SOMF ¶¶ 27, 30-36.) In 2022, the parties agreed to a Memorandum of Agreement in lieu of signing a CBA. (*Id.* ¶ 36.) As of Tortora's deposition on April 17, 2025, a CBA had still not yet been signed. (D.E. 95-3 & Ex. A, Deposition of Detective David Tortora ("Tortora Dep.") at 34:6-25.)

Tortora and Borough Administrator Gallo clashed during their negotiations from 2018 to 2022. (D.E. 95-1, Pls. SOMF ¶ 7; D.E. 95-3 & Ex. A, Tortora Dep. at 110:9-111:17; D.E. 95-3 & Ex. E, Deposition of Chief Mustafa Rabboh ("Rabboh Dep.") at 24:13-25:16; D.E. 95-3 & Ex. D, Deposition of Councilwoman Ora Kornbluth ("Kornbluth Dep.") at 78:8-19.) At a Council meeting in August 2018, Tortora, acting as PBA president, publicly accused Gallo of refusing to negotiate in good faith and of not being transparent with the mayor and Councilmembers. (D.E. 94-2, Defs. SOMF ¶ 26; D.E. 95-1, Pls. SOMF ¶¶ 15-16; D.E. 95-3 & Ex. A, Tortora Dep. at 25:19-26:18.) Tortora's complaints persisted throughout the CBA negotiations, and he was vocal about them to the Borough. (*See* D.E. 95-3 & Ex. I, Tortora 8/4/18 Email to

Councilwoman Kornbluth, at 1; D.E. 95-3 & Ex. N, Tortora 5/29/19 Email to Councilmembers, at 1; D.E. 95-3 & Ex. Y, Tortora 12/22/21 Email to Councilmembers, at 1.)

In turn, Gallo blamed Tortora for holding up CBA negotiations and voiced his concerns to BPD members. Deputy Chief Chrisopher Massey certified that in October of 2018, during the Borough's annual "Trunk or Treat," Gallo told him and then-Chief Cathy Madalone that Tortora should be immediately removed from the detective bureau.[3] (D.E. 95-3 & Ex. K, Deputy Chief Chrisopher Massey Certification ("Massey Cert.") ¶¶ 2, 6; D.E. 95-3 & Ex. A, Tortora Dep. at 75:20-76:20.) Massey said that Madalone responded, "You are not the Chief, and you do not make those decisions," and Gallo replied, "Yea yea, I'll tell you what, as long as I'm here, that mother fucker will never get promoted." (D.E. 95-3 & Ex. K, Massey Cert. ¶¶ 7-8.)

According to Gallo, Tortora did not have the younger BPD officers' best interests in mind. (D.E. 95-3 & Ex. C, Gallo Dep. at 60:20-61:8.) In December 2021, Gallo emailed Chief Mustafa Rabboh, who replaced Madalone as Chief, that "the Union does not care about its younger members . . . it's the senior membership of the PBA who has taken us in the direction we have gone and they continue to litigate matters further with no regard to the adverse impact these issues have on the younger officer[s]." (D.E. 95-3 & Ex. S, Email Chain, at p. 340.) The "direction" and "adverse impact" Gallo referred to was the Borough's freeze in hiring or promoting BPD officers. (*See id.* at p. 304-341.)

In November 2021, Councilman Rivera suggested to a BPD officer that the PBA should remove Tortora as president because he was "not easy to negotiate with." (D.E. 93-5 & Ex. X, Certification of Officer Gregory Slater, at 1; *see* D.E. 93-5 & Ex. Y, Tortora 12/22/21 Email to Councilmembers, at 1.)

---

[3] Gallo disputes having said this. (D.E. 95-3 & Ex. C, Gallo Dep. at 31:14-33:8.)

As to Miller, in January 2021, the BPD's Honor Guard declined to show up at a Mayor and Council reorganization meeting as a protest about how the Borough was handling the CBA negotiations. (D.E. 94-2, Defs. SOMF ¶ 39; D.E. 95-1, Pls. SOMF ¶¶ 43, 48.) The Honor Guard made this decision as a collective, but on a personal level Miller felt the Borough disrespected him. (D.E. 95-1, Pls. SOMF ¶¶ 47-48; D.E. 95-3 & Ex. B, Miller Dep., at 78:21-79:17.) Members of the Borough Council knew Miller was a member of the Honor Guard and they felt "extremely disappointed," "unhappy," and "offended" that the Honor Guard was not at the meeting. (D.E. 95-1, Pls. SOMF ¶¶ 50-52; D.E. 95-3 & Ex. C, Gallo Dep. at 80:18-21; D.E. 95-3 & Ex. D, Kornbluth Dep. at 100:14-21; D.E. 95-3 & Ex. P, Mayor Arvin Amatorio ("Amatorio Dep.") at 17:10-17; D.E. 95-3 & Ex. F, Councilman Thomas Lodato ("Lodato Dep.") at 18:20-19:3, 20:4-17.)

Captain John Maggi told Miller that he committed "career suicide" by not going to the meeting. (D.E. 95-1, Pls. SOMF ¶ 53; D.E. 95-3 & Ex. B, Miller Dep. at 87:19-89:4.) Thereafter, with Gallo's support, Rabboh disbanded the Honor Guard. (D.E. 95-1, Pls. SOMF ¶ 54; D.E. 95-3 & Ex. C, Gallo Dep. at 83:3-24; D.E. 95-3 & Ex. E, Rabboh Dep. at 44:2-45:15.)

**B. The Internal Promotional Lists and Vacancies**

On September 26, 2019, Gallo certified new BPD civil service promotional lists for the ranks of Captain, Lieutenant, and Sergeant. (D.E. 95-1, Pls. SOMF ¶ 29; D.E. 95-3 & Ex. O, Promotional Lists.) The lists rank officers based on various considerations, including their seniority and civil service exam score. (D.E. 95-3 & Ex. B, Miller Dep. at 100:11-103:11.) The Borough Council may choose to promote any of the top three ranked officers on their respective lists, but disabled veterans may not be skipped over. (*Id.* at 102:10-25; D.E. 95-1, Pls. SOMF ¶¶ 39, 56.) For example, if a disabled veteran is ranked first on the civil service promotional list

for the rank of Captain, that person must be promoted to Captain before any other officer; but a nondisabled veteran ranked first may be skipped over for the second or third ranked officer. The promotional lists for Lieutenant and Sergeant were due to expire in March and May of 2022 respectively. (D.E. 95-1, Pls. SOMF ¶¶ 112, 116.)

On January 31, 2020, the Borough made three promotions: Lieutenant John Maggi was promoted to Captain, Sergeant Nicholas Deleon was promoted to Lieutenant, and Officer Daynel Ozorio was promoted to Sergeant. (D.E. 95-3 & Ex. O, Promotional Lists, at 1-3.) Then on July 21, 2020, Sergeant Richard Ramos was promoted to Lieutenant, while another Lieutenant retired. (D.E. 95-1, Pls. SOMF ¶¶ 36, 41.) By July 2020, there was one Lieutenant and one Sergeant vacancy left within the BPD. (D.E. 95-3 & Ex. C, Gallo Dep. at 73:6-76:22; *see* D.E. 95-3 & Ex. S, Email Chain, at p. 318.) By September 2021, there was still one Lieutenant vacancy and another Sergeant vacancy had been added. (D.E. 95-3 & Ex. S, Email Chain, at p. 307.)

Miller was next in line to be promoted to fill the Lieutenant vacancy. (D.E. 95-1, Pls. SOMF ¶ 37; D.E. 95-3 & Ex. O, Promotional Lists, at 1.) Rispoli and Tortora were next in line to be promoted to Sergeant; another officer, John Brown, was not eligible for promotion since he was on administrative leave pending termination. (D.E. 95-3 & Ex. O, Promotional Lists, at 3; D.E. 95-3 & Ex. C, Gallo Dep. at 71:11-72:14, 75:8-16.)[4] Tortora is a disabled veteran and could not be skipped over. (D.E. 95-1, Pls. SOMF ¶ 39.)

---

[4] The Borough disputes that Tortora was effectively ranked third on the civil service promotional list for the rank of Sergeant, stating instead that he was ranked sixth. (D.E. 94-2, Defs. SOMF ¶ 7.) From the record on this motion, it appears the Borough is using the May 2018 civil service "eligible/failure roster"—in which officers' test scores were listed from highest to lowest and Tortora ranked sixth—and not the September 2019 Sergeant civil service promotional list, which the Borough uses for promotions and which ranks him fourth. (*Compare* D.E. 94-6 & Ex. K, Eligible/Failure Roster, at 2 *with* D.E. 95-3 & Ex. O, Promotional Lists, at 3; *see also* D.E. 95-3 & Ex. B, Miller Dep. at 100:19-102:25; D.E. 95-3 & Ex. C, Gallo Dep. at 11:7-25.)

**C. Gallo and the Borough Council Reject Chief Rabboh's Requests for Promotions in 2021**

The record reflects Police Chief Robboh's ongoing concern about the vacancies existing after the 2020 promotions. (D.E. 95-3 & Ex. E, Rabboh Dep. at 58:23-60:2; *see generally* D.E. 95-3 & Ex. S, Email Chain.) In 2021, the Borough Council approved the hiring of one new officer and two lateral officers from other police departments. (D.E. 95-3 & Ex. S, Email Chain, at p. 305; D.E. 95-3 & Ex. C, Gallo Dep. at 129:12-130:22.)

In June 2021, Rabboh requested three promotions to "fill positions which were vacated with retirees" that were "causing hardship with the efficiency of the department." (D.E. 95-3 & Ex. S, Email Chain, at p. 305; D.E. 95-3 & Ex. E, Rabboh Dep. at 58:17-61:1.) He told the Borough that these promotions would go to Miller, Rispoli, and Tortora. (D.E. 95-3 & Ex. E, Rabboh Dep. at 67:16-68:1.) On August 26, 2021, he emailed Gallo, Councilman Rivera, and Mayor Amatorio, that the promotions were "needed prior to the end of this year." (D.E. 95-3 & Ex. S, Email Chain, at p. 305.)

Gallo emailed back the same day, telling Rabboh that "[t]he Governing Body will not proceed on the hiring of additional supervisors until a full analysis is conducted." (*Id.* at p. 304.) According to Rabboh and Councilwoman Kornbluth, a full analysis like this had never been requested before; usually the Borough Council approved the Chief's promotional requests because he was in the best position to determine the needs of the BPD. (D.E. 95-1, Pls. SOMF ¶¶ 57-58, 65-66; D.E. 95-3 & Ex. S, Email Chain, at p. 318 ("I [Chief Rabboh] have supplied

---

On this motion for summary judgment, the Court views the evidence in plaintiffs' favor as the non-moving party. *Harvard v. Cesnalis*, 973 F.3d 190, 199 (3d Cir. 2020) (citing *Reedy v. Evanson*, 615 F.3d 197, 210 (3d Cir. 2010)). The reason Tortora is effectively ranked third is that Officer Brown, who was ranked ahead of Tortora, was not eligible for a promotion, which the Borough does not dispute. (D.E. 95-3 & Ex. O, Promotional Lists, at 3; D.E. 95-3 & Ex. C, Gallo Dep. at 75:8-16.)

this council with documents / reasons for needed promotions that no other Chief has been subjected to."); D.E. 95-3 & Ex. D, Kornbluth Dep. at 49:1-8 (testifying that this was the first time the Borough Council requested "a full analysis of the need for these particular promotions").)

In any event, Rabboh abided by Gallo's request to render a "full analysis," and in a September 8, 2021 email to Gallo and other Councilmembers he compared the supervisor/officer makeup of neighboring towns with the BPD's and outlined what the BPD's table of organization[5] required and also attended a Council meeting the following day. (D.E. 95-3 & Ex. S, Email Chain, at p. 306-307; D.E. 95-3 & Ex. E, Rabboh Dep. at 71:10-72:2.) In the email, Rabboh told the Borough that the BPD was currently operating with four Lieutenants instead of five, five Sergeants instead of seven, and 31 officers instead of 35. (D.E. 95-3 & Ex. S, Email Chain, at p. 307.) The table of organization also called for 15 supervisors, but the BPD was operating at 13. (*Id.*) He ended by "implor[ing] [Gallo and the Borough Council] to take a look at these figures and move forward with the promotions." (*Id.*) According to Rabboh, the Borough never advised him that the information he provided was unsatisfactory.[6] (D.E. 95-3 & Ex. E, Rabboh Dep. at 74:3-75:1.)

In early October 2021, Councilman Rivera emailed Gallo and Mayor Amatorio to ask when they would be moving forward with promotions. (D.E. 95-3 & Ex. S, Email Chain, at p. 315.) In response, Gallo emailed back that "The promotion exams are being updated and I

---

[5] The BPD's table of organization was approved by the Borough Council in 2016 and delineates how many officers should occupy each rank and what the supervisor to patrol ratio should be. (D.E. 95-3 & Ex. D, Kornbluth Dep. at 56:13-58:23, 90:10-19; D.E. 95-3 & Ex. T, Table of Organization.)

[6] Gallo disputes this. (D.E. 95-3 & Ex. C, Gallo Dep. at 106:6-107:18.)

would recommend that the Governing Body waits until the new promotion lists come out. I would think we should wait until 2022 so we can start with a clean slate unless there is a reason otherwise." (*Id.*) Mayor Amatorio responded that "I spoke with [Gallo] yesterday and he expressed his opinion. I still believe[] that we are opening ourselves to another lawsuit if we don't proceed with promotion. We should really analyze this situation." (*Id.* at p. 314.) Councilman Marte responded, "I believe we should proceed with the promotions to avoid another lawsuit. If we're eventually going to promote as previously discussed, why wait." (*Id.* at p. 316.) According to Councilwoman Kornbluth (and disputed by Gallo), Gallo was "strongly against" making these promotions. (D.E. 95-3 & Ex. D, Kornbluth Dep. at 91:21-25, 106:11-22.)

On October 29, Rabboh emailed Gallo and the Borough Council again: "This is the 4th request for promotions. I have submitted several emails and attended several closed sessions in order to provide you whatever information was needed to fill positions that were left vacant due to retirements." (D.E. 95-3 & Ex. S, Email Chain, at p. 318.) He stated that it was "unheard of" for these positions to be vacant for so long and the delay was hurting the BPD. (*Id.*) Rabboh acknowledged that the Borough Council and the PBA were in an ongoing contract dispute but urged that "[p]romotions should not be affected in any way with the contract and should take place as needed." (*Id.*)

Gallo responded a few hours later, and the Court reproduces his email in full:

**From:** Corey Gallo
**Sent:** Friday, October 29, 2021 5:15:41 PM
**To:** Mustafa Rabboh ; Mayor Arvin Amatorio
**Cc:** hrivera@bergenfield.com ; aamatorio@bergenfield.com ; 'okornbluth (okornbluth@bergenfield.com)' ; Mark Pascual ; Buddy Deauna ; Tom Lodato ; John L. Shahdanian - (Jshahdanian@marc.law) ; John Schettino
**Subject:** RE: Hires / Promotions

Chief,

Thanks for the email. With regards to promotions and what is written below, I would like to remind you of a few items. The Lt. list is expired and I have since found out that because of COVID, the Sgt list which was supposed to expire 5/23/21 may have been extended a year but I want to confirm that from CSC. With that said, we have patrol positions that also need to be filled. If we make the 3 promotions you are seeking, it will leave 5 patrol position openings. Our patrolman to supervisor ratio is already unbalanced and making promotions now will only create a further in-balance. In addition, in light of the arbitration award issued, until the contract is signed by the PBA, the Borough should not hire new officers. As you are aware, if we hire officers prior to a contract signed those officers would be compensated under the existing agreement which would align them with the current 6 step pay scale as opposed to the 10-step guide the arbitrator issued. So why would the Borough do that?

In closing, to ask the Governing Body for promotions 4 different times knowing the history and issues created and now knowing the outcome from those litigations and the reaction and disrespect the membership had towards this Governing Body is placing the Governing Body in an awkward position and frankly selfish on your part. This M&C had confidence in you to manage this department and frankly, you need to respectfully start doing your part as management (not one of the guys) to recognize everything taking place. As the BA for this town, one of my responsibilities is to insulate the Governing Body from issues; not always comfortable but I know my role and I do what I need to for their betterment. As management and as head of the Police Department, the same applies to you! It's time for you to step up, stop making excuses and begin making real changes as it relates to outreach and effective patrol enforcement and please stop making excuses on why you can't do you job. I am sorry if this comes off harsh to you however, I do not appreciate it when we have conversations where I explain the position of Governing Body and you then generate an email requesting to meet with them again as if what I said is made up. Do you think I am misrepresenting them when I speak with you? This email clearly makes me believe that. Everything I state to you when we speak comes from the consensus of the Governing Body. Example, the Governing Body wanted to present the offer recently presented to PBA. Personally, I did not think the Borough needed to because of the recent court decisions rendered yet, this is not my call and as such, presented the PBA with the offer. With regards to having a meeting in closed with the Governing Body, I will speak to all of them in the next day or so and based on their collective decision, will advise you whether or not we have anything else to discuss.

Thank you.
Respectfully,

(*Id.* at p. 324-325.)

Rabboh responded the next day:

On Oct 30, 2021 11:01 AM, Mustafa Rabboh wrote:
Boro Administrator Gallo,

I must admit, I'm deeply disappointed in your response. This email was sent to the governing body as it is they who decide whether to proceed with hires / promotions. I always copy you as a courtesy / respect factor as you are the BA.

However, your response to my email addressed to the council is not only offensive to me but outright disrespectful. I have never been disrespectful towards you or the council. We may not always agree on everything, as evident in this email, but I've never crossed the line. To personally attack me and my work ethics for asking for promotions is inappropriate and deeply insulting.

There are many glaring discrepancies in your response that I can address:

1. **Both the Lt. list and the Sgt. list are active**, they were due to expire in 2021 but due to COVID, they both got extended for another year or at the very least, until the results of a new test come out. As of now, the Sgt. List will expire on May 23, 2022 and the Lt. List will expire on March 7th, 2022. **"In compliance with the decision, Bergenfield's list for Lieutenant will be extended until a maximum date of 3/7/2022 and the Sergeant will be extended until a maximum date of 5/23/2022. In accordance, we will then issue new announcements for these levels in July 2021 and October 2021 respectively. If these new announcements result in lists that come out prior to 3/7/2022 or 5/23/2022, the old lists will then be expired when the new lists come out."** (directly from civil service)
2. Making three promotions will not leave five patrol position openings (it will leave one additional patrol openings, as the newly promoted sergeant will go to patrol and the current sergeant from patrol will go to the detective bureau. Only one (1) officer will be removed from patrol. With the new hires, that officer will be replaced within a short period of time. **I agree with you that new hires should go on the new 10 step guide and reiterated that to you many times during conversations.**
3. Our supervisor to patrol ratio is the lowest of all the neighboring towns as provided by me in the past. We are not meeting our Table of Organization. The same Table of Organization that's been in effect since I've been here in 2003, other than the council creating a new position (Deputy Chief). I want the department to run efficiently and asking for **others** to be promoted is the opposite of being selfish, as you alluded to. Maybe, if I didn't care so much, then I could be called selfish.

Quite Frankly, I believe I've done a great job of managing this department. The membership has been in a contract dispute for the past 4-5 years and all they want is to feel valued. During my tenure as Chief, I've faced unprecedented challenges that no other chief has faced before me. The Covid 19 pandemic which we're still experiencing, the mass civil unrest and protests that followed with the killing of George Floyd, the many late night zoom meetings that I participated in that you can attest to in order to ensure the safety of our residents. In short, I don't make excuses, I've accepted these challenges and knowing that none of my officers or residents were harmed in any way leads me to believe that I succeeded. All this while still dealing with frivolous lawsuits and lawsuits prior to me becoming Chief that I inherited. Still, I've managed to keep officers motivated while limiting overtime to a minimum.

> Please do not ever question my ethics and the way I handle my job responsibilities. I've given 110% of myself to make sure this department is run efficiently and the residents do not suffer. I always try to lead by example and one being is that I'm always at work or working from home. Other than COVID, I have not used a sick day in 5 years. All the challenges that I faced above have occurred during my first two years as Chief, while getting acclimated to the position. Yes, I've been thrown into the fire, sort of speak, but I've risen to every challenge and obstacle faced and as a result, I've come out a smarter and stronger leader.
>
> The last thing I want is to have a bad relationship with anyone on this email chain. As management, we should be working together, not attacking one another.
>
> Respectfully,
>
> Chief Rabboh

(*Id.* at p. 323-324.)

Gallo emailed back that "[y]ou missed the whole point of what I wrote"; the Borough Council "do[es] not want to proceed until a contract is agreed to"; and Rabboh's repeated requests were not "appreciate[d]." (*Id.* at p. 331.) In his deposition, Gallo testified that because of the CBA negotiations, the Borough was uncertain what steps the new hires would come in at, so it decided not to promote internally.[7] (D.E. 95-3 & Ex. C, Gallo Dep. at 128:10-130:22.) Gallo admitted that he was mistaken when he told Rabboh that the lists were expired. (*Id.* at 115:13-120:1, 126:16-20.) He still disagreed with Rabboh about the number of patrol openings should promotions proceed (one vs. five). (*Id.* at 134:10-138:14.) He acknowledged that Rabboh was in the best position to gauge the needs of the BPD as Chief. (*Id.* at 12:12-16.) The record reflects that all defendants agree that Rabboh was in the best position to determine the needs of the BPD. (D.E. 95-1, Pls. SOMF ¶ 57.)

---

[7] Plaintiffs point out that the Borough apparently did not have the same concerns when it promoted internally in 2020 or when it hired the three new and lateral officers in the summer of 2021, and additionally that the CBA would not have impacted their steps because the CBA only affects new officers' steps. (D.E. 95-1, Pls. SOMF ¶¶ 63, 102-104; D.E. 95-3 & Ex. D, Kornbluth Dep. at 65:2-17, 85:25-86:20; D.E. 95-3 & Ex. E, Rabboh Dep. at 58:3-14.) Whether the latter is so remains a disputed fact. (*See* D.E. 100, Reply, at 7-8 (arguing that the 2021 "lateral transfers were hired at the same salary line where they had come from, and thus, the future financial impact of such hires were known at the time they were made, unlike any potential BPD promotion during this time period").)

The record contains differing explanations for why members of the Borough Council continued to refuse Rabboh's promotion requests. Mayor Amatorio testified that Rabboh's analysis as to why the promotions were needed was not satisfactory. (D.E. 95-3, Ex. P, Amatorio Dep. at 25:1-35:16.) Gallo echoed this critique, but Rabboh testified that this was never communicated to him. (D.E. 95-3 & Ex. C, Gallo Dep. at 98:6-103:16, 105:22-107:6; D.E. 95-3 & Ex. E, Rabboh Dep. at 74:6-75:1.) Mayor Amatorio also believed, along with Councilman Lodato, that there would not have been enough patrolmen on the street if they made these internal promotions, reiterating points made in Gallo's October 29, 2021 email. (D.E. 95-3 & Ex. P, Amatorio Dep. at 19:23-20:19; D.E. 95-3 & Ex. F, Lodato Dep. at 47:6-14.)

Councilman Pascual thought that plaintiffs "weren't up for promotion." (D.E. 95-3 & Ex. R, Deposition of Councilman Marc Pascual ("Pascual Dep.") at 25:6-10.) Councilwoman Kornbluth believed that the BPD already had enough supervisors, but acknowledged that they had less than the table of organization required and otherwise testified that the financial impact of the internal promotions would have been insignificant. (D.E. 95-3 & Ex D, Kornbluth Dep. at 52:25-55:25, 65:23-66:8, 68:17-71:2.) Councilman Rivera testified that it was because of the stall in the CBA negotiations, and that "you get what you give." (D.E. 95-3 & Ex. Q, Councilman Hernando Rivera ("Rivera Dep.") at 42:25-44:24.)

On December 9, Rabboh sent Gallo and Councilmembers another email. (D.E. 95-3 & Ex. S, Email Chain, at p. 340-341.) He told them he was down seven officers due to medical/military leave and transfers and repeated that "the need to hire is becoming more urgent by the day." (*Id.* at p. 341.) Gallo responded that "[t]his is understandable considering the fact the Union does not care about its younger members," indicating that the hiring freeze would continue, and to make do to "weather the storm." (*Id.* at p. 340.)

Ultimately, the Borough let the Lieutenant and Sergeant promotional lists expire without making any promotions. (D.E. 95-1, Pls. SOMF ¶¶ 112, 116.)

**III. Procedural History**

On March 23, 2023, plaintiffs filed a complaint against the Borough, alleging that they were denied career advancement in violation of statutory and constitutional law. (D.E. 1.) After the Borough filed a motion to dismiss, plaintiffs filed an amended complaint which raised eight counts for First Amendment retaliation and equal protection violations under 42 U.S.C. § 1983, and violations of the New Jersey Constitution and the New Jersey Civil Rights Act, N.J.S.A. 10:6-2. (D.E. 8.) The Borough moved to dismiss the amended complaint. (D.E. 11.)

On March 29, 2024, the Court partially granted the motion by dismissing Counts Six and Seven, which raised claims for First Amendment retaliation based purely on plaintiffs' association with the PBA and support of Tortora. (D.E. 49, Opinion, at 19-20.) The Borough filed an answer (D.E. 58), and the parties proceeded with discovery.

On February 20, 2026, the Borough filed this motion for summary judgment, arguing that because of the ongoing CBA negotiations, it had a legitimate, nondiscriminatory reason for the promotion freeze, and would have made the promotion freeze regardless of plaintiffs' speech. (D.E. 94, Mov. Br., at 6-13, 16-19.) It additionally argues that Miller's speech was not protected because he was speaking as a public employee with the Honor Guard. (*Id.* at 13-16.)

In their opposition, plaintiffs consented to the dismissal of their equal protection and NJLAD racial discrimination claims, leaving only the First Amendment retaliation claims asserted in Counts Three, Four, Five, and Eight. (D.E. 95, Opp., at 15.) Plaintiffs argue that "[t]he record contains substantial evidence from which a reasonable jury could conclude that Plaintiffs' protected activities were substantial or motivating factors in Defendants' decision to

deny their promotions and allow the promotional lists to expire." (*Id.* at 11-14.) Plaintiffs further argue that Miller spoke as a citizen, not a public employee, in protesting the January 2021 Mayor and Council reorganization meeting because the Honor Guard is a volunteer unit of the BPD. (*Id.* at 6-10.)

In reply, the Borough reiterates that it could not determine the financial and budgetary impacts that promotions would have under the new CBA, which is a nondiscriminatory reason for its promotion freeze. (D.E. 100, Reply, at 6-8.) And the Borough submits that because the Honor Guard represented the BPD, Miller's speech was made pursuant to his official duties and is unprotected. (*Id.* at 3-5.)

## IV. Standard of Review

Summary judgment is proper if the movant demonstrates that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "A dispute is 'genuine' if 'a reasonable jury could return a verdict for the nonmoving party,' . . . and a fact is 'material' where 'its existence or nonexistence might impact the outcome of the suit under the applicable substantive law.'" *Baloga v. Pittston Area Sch. Dist.*, 927 F.3d 742, 752 (3d Cir. 2019) (quoting *Santini v. Fuentes*, 795 F.3d 410, 416 (3d Cir. 2015)). Facts are reviewed in the light most favorable to the nonmoving party. *Id.*

The Court may not weigh evidence or determine credibility on a motion for summary judgment but instead assesses "whether there is a genuine issue for trial." *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). "If so, summary judgment cannot stand." *Reedy*, 615 F.3d at 210. And "when there is a disagreement about the facts or the proper inferences to be drawn from them, a trial is required to resolve the conflicting versions of the parties." *Id.* (quoting *Peterson v. Lehigh Valley Dist. Council*, 676 F.2d 81, 84 (3d Cir. 1982)).

**V. Discussion**

A First Amendment retaliation claim under 42 U.S.C. § 1983 requires a plaintiff to prove that "(1) he engaged in 'constitutionally protected conduct,' (2) the defendant engaged in 'retaliatory action sufficient to deter a person of ordinary firmness from exercising his constitutional rights,' and (3) 'a causal link [existed] between the constitutionally protected conduct and the retaliatory action.'" *Baloga*, 927 F.3d at 752 (quoting *Palardy v. Twp. of Millburn*, 906 F.3d 76, 80-81 (3d Cir. 2018)).

A public employee's statement is protected by the First Amendment and satisfies the first prong when (1) the employee spoke as a citizen; (2) the statement involved a matter of public concern; and (3) the government employer did not have "an adequate justification for treating the employee differently from any other member of the general public." *Id.* at 753 (citing *Palardy*, 906 F.3d at 81). Here, the Borough challenges the first part of this subtest as to Miller alone. (D.E. 94, Mov. Br., at 14-15.)

The second element of a First Amendment retaliation claim is a "fact intensive inquiry" that focuses on "the status of the speaker, the status of the retaliator, the relationship between the speaker and the retaliator, and the nature of the retaliatory acts." *Brennan v. Norton*, 350 F.3d 399, 419 (3d Cir. 2003) (quoting *Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 686 (4th Cir. 2000)). A defendant "adversely affects an employee's First Amendment rights when it . . . makes decisions, which relate to *promotion*, transfer, recall and hiring, based on the exercise of an employee's First Amendment rights." *Id.* (emphasis added) (quoting *Suarez*, 202 F.3d at 686).

As to the third element, a plaintiff must demonstrate "that his constitutionally protected conduct was a 'substantial' or 'motivating factor' in the allegedly retaliatory conduct." *Baloga*,

927 F.3d at 759 (quoting *Suppan v. Dadonna*, 203 F.3d 228, 235 (3d Cir. 2000)). A causal connection may be established if the plaintiff shows "(1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link." *Id.* (quoting *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007)). Conversely, a defendant seeking to prevail on summary judgment "must present evidence of such quality that no reasonable juror could conclude that the protected activity was the but-for cause of the termination." *Id.* (quoting *Hill v. City of Scranton*, 411 F.3d 118, 126 n.11 (3d Cir. 2005)).

When a plaintiff demonstrates that his speech was a "substantial" or "motivating" factor in the adverse action, the burden shifts to the defendant to prove "that it would have reached the same decision . . . even in the absence of the protected conduct." *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977); *see also Nicholas v. Pa. State Univ.*, 227 F.3d 133, 144 (3d Cir. 2000) (applying *Mt. Healthy*). The Borough submits that it has satisfied its burden with evidence that it did not want to make internal promotions until the terms of a new CBA were finalized so that the financial implications of such promotions were certain. (D.E. 94, Mov. Br., at 18.)

A reasonable jury could find that plaintiffs have submitted evidence to support that their speech motivated the Borough in deciding not to make internal promotions and thereby avoided promoting them. The record shows that the Borough instituted a freeze on internal promotions from July 2020, which occurred contemporaneously with their speech; there was well-documented antagonism between the parties throughout the freeze; and despite regular requests by the BPD that the promotions go forward, the freeze on internal promotions was prolonged

until promotional lists expired in March and May of 2022 when the Borough would no longer have to promote Tortora or Miller.

Emails between Gallo and Rabboh showcase Gallo's—and ultimately, the Borough's—resistance about making internal promotions, and it is for a jury to decide whether this was retaliatory against Miller and Tortora. The record shows that the Councilmembers gave inconsistent explanations for the promotion freeze, that the Borough made internal promotions in 2020 despite the ongoing CBA negotiations, and that the Borough hired one new officer in 2021 despite the uncertain financial impact of any new CBA. Plaintiffs have adduced evidence that from July 2020 to 2022 they were next in line[8] to be promoted and Tortora, whose contentious relationship with Gallo is established in the record, could not be skipped due to his disabled veteran status.

Testimony by Councilmembers show their frustration with Miller and Tortora. (*See* D.E. 95-3 & Ex. K, Massey Cert. ¶ 6 (attesting that Gallo asked for Tortora to be removed as PBA president after Tortora made critical remarks about him); D.E. 95-3 & Ex. A, Tortora Dep. at 75:20-76:20 (same); D.E. 93-5 & Ex. X, Certification of Officer Gregory Slater, at 1 (Councilman Rivera suggesting that Tortora should be removed as PBA president); D.E. 95-3 & Ex. C, Gallo Dep. at 80:18-21 (Gallo testifying that he felt "extremely disappointed" that Miller and the Honor Guard protested the Mayor and Council reorganization meeting); D.E. 95-3 & Ex. D, Kornbluth Dep. at 100:14-21 (Councilwoman Kornbluth testifying that she felt surprised, and that Gallo was "angry"); D.E. 95-3 & Ex. P, Amatorio Dep. at 17:10-17 (Mayor Amatorio was unhappy); D.E. 95-3 & Ex. F, Lodato Dep. at 18:20-19:3, 20:4-17 (Councilman Lodato was "offended").)

---

[8] That the Borough disputes that Tortora was next in line creates a genuine issue of material fact.

The record evidence is such that the Borough has not met plaintiffs' evidence that their speech was a motivating factor behind the freeze with evidence they would have instituted a freeze anyway. The Borough gave the inconsistent justifications for the freeze; the Borough stalled in assessing Rabboh's repeated requests for internal promotions, making an unprecedented demand for a "full analysis" for the need to replace vacancies; and despite Rabboh's supplying a "full analysis," the Borough still failed to act until the promotional lists expired.

Addressing the Borough's other argument that Miller's speech was not constitutionally protected, the issue comes down to whether he spoke as a citizen or as a BPD employee when he did not bring the Honor Guard to the January 2021 Mayor and Council reorganization meeting in protest about the stalled CBA negotiations.

"[I]t is essential that public employees be able to speak out freely on questions of public concern without fear of" retaliation. *Watters v. City of Phila.*, 55 F.3d 886, 891 (3d Cir. 1995). "Judicial vigilance is required to ensure that public employers do not use their authority to silence discourse on matters of public concern simply because they disagree with the content of the employee's speech." *Id.* However, state employers still have an interest "in regulating the speech of its employees" that differs "significantly from those it possesses in connection with regulation of the speech of the citizenry in general." *Id.* (quoting *Pickering v. Board of Educ.*, 391 U.S. 563, 568 (1968)).

While the question of whether a public employee spoke as a private citizen is a question of law, "[w]hether a particular incident of speech [was] made within a particular plaintiff's job duties is a mixed question of fact and law." *Dougherty v. Sch. Dist. of Phila.*, 772 F.3d 979, 988 (3d Cir. 2014) (quoting *Foraker v. Chaffinch*, 501 F.3d 231, 240 (3d Cir. 2007)). The key

question in the citizen speech analysis is "whether the speech at issue is itself *ordinarily* within the scope of an employee's duties." *Lane v. Franks*, 573 U.S. 228, 240 (2014) (emphasis added); *see Dougherty*, 772 F.3d at 988, 990 (holding that a school district employee spoke as a citizen for First Amendment purposes because his "routine job responsibilities" did not include reporting the superintendent's alleged misconduct to the press or to the school board).

In *Garcetti v. Ceballos*, the Supreme Court held that a prosecutor's internal memorandum advising his supervisors about how to proceed with a pending case was speech made pursuant to his official duties. 547 U.S. 410, 420-21 (2006). The Court reasoned that writing the memo was part of the prosecutor's "daily professional activities" and what he "was employed to do" as a government employee, distinguishable from "the kind of activity engaged in by citizens who do not work for the government." *Id.* at 421-23. In finding that the prosecutor did not speak as a citizen, the Court "simply reflect[ed] the exercise of employer control over what the employer itself has commissioned or created." *Id.* at 422. The Court declined to advance a framework for defining when an employee speaks pursuant to his official duties, instead stating that "[t]he proper inquiry is a practical one." *Id.* at 424.

Here, viewing the facts in the light most favorable to Miller, the Court finds that the Borough has not proven as a matter of law that his protest of the Mayor and Council reorganization meeting was within the scope of his duties as a BPD police officer. Miller testified that the Honor Guard is made up of volunteer members who would attend Mayor and Council reorganization meetings. (D.E. 95-3 & Ex. B, Miller Dep., at 74:4-9.) Miller also testified, without dispute, that participation in the Honor Guard is informal; officers did not have to fill out paperwork or be appointed, all they had to have was a "conversation" with the captain in charge stating that they would like to volunteer. (*Id.* at 74:10-75:2.) Honor Guard members

were compensated for attending functions only when they were otherwise not scheduled to work. (D.E. 95-3 & Ex. E, Rabboh Dep. at 48:14-21.) The Honor Guard decided to protest the 2021 meeting because the PBA was "in a heated contract battle with the mayor and council," and some Honor Guard members were PBA members. (D.E. 95-3 & Ex. B, Miller Dep., at 76:4-77:23.) As to Miller himself, he testified that he felt disrespected by the Borough in its handling of the CBA negotiations. (*Id.* at 78:21-79:17.)

On these facts, a reasonable jury could find that Miller's protest was not part of his "daily professional activities," nor was it what he was "employed to do" as a BPD officer. *Garcetti*, 547 U.S. at 421-22. The Court denies the Borough's motion to grant summary judgment in its favor on his claims.

**VI. Conclusion**

Plaintiffs have adduced ample evidence about the tension between the Borough and the PBA, of which Tortora was president and before that, a leader. This erupted in a particularly strong comment by Borough Administrator Gallo that Tortora would never be promoted which, while disputed, is part of the record and requires factfinding. The record strongly suggests that the Borough would have to promote Tortora if it hadn't instituted a freeze on internal promotions. (*See* footnote 4 *supra*.) Plaintiffs further have adduced evidence that supports Miller's claims that his speech in refusing to show up with the Honor Guard at a Borough event was protected. The again ample evidence of multiple and conflicting reasons for the Borough's refusal to make internal promotions in the face of the Police Chief's "imploring" the Borough Council to do so supports plaintiffs' claims that the freeze was retaliatory. There is, therefore, record support for plaintiffs' First Amendment claims. *Baloga*, 927 F.3d at 761 ("Because a trier of fact could conclude on this record that Baloga would not have been transferred in the absence

of his union activities, the quintessential 'factual issue' of causation remains, in this case, a question for the jury." (internal citation omitted)).

The Borough's motion for summary judgment is denied. An appropriate order accompanies this opinion.

Dated: August 18, 2026

*/s/ Katharine S. Hayden*
Katharine S. Hayden, U.S.D.J.